UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Cause 1:14CR29 SNLJ (SPM) |
| ) | |
| ) | |
| PENNY COLEMAN, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

In accordance with the Memorandum filed herein,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements (Doc. No. 26) be **DENIED.**

The parties are advised that they have **fourteen (14)** days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Trial in this case has been set on **August 18, 2014** at **3:00 P.M.** before the Honorable Stephen N. Limbaugh, Jr.

                                              /s/Shirley Padmore Mensah
                                              SHIRLEY PADMORE MENSAH
                                              UNITED STATES MAGISTRATE JUDGE

Dated this 17th day of July, 2014.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Cause 1:14CR29 SNLJ (SPM) |
| | ) |
| | ) |
| PENNY COLEMAN, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM**

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). On December 28, 2013, Defendant Penny Coleman ("Defendant" or "Coleman") was arrested for driving with a suspended license following a vehicle stop by officers of the Sikeston Department of Public Safety. After Defendant was placed under arrest, the officers searched the vehicle and seized a firearm found in the vehicle.

On April 23, 2014, Coleman was charged in an indictment with being a felon in possession of a firearm. On May 27, 2014, Defendant filed a Motion to Suppress Evidence and Statements contending, in essence, that all evidence and statements should be suppressed because the information leading the officer to stop Coleman's vehicle was constitutionally insufficient to justify the vehicle stop. (Doc. No. 26). The United States filed a response opposing the motion. (Doc. No. 28). The undersigned held an evidentiary hearing on June 13, 2014. At the hearing, Sikeston Officers Bobby Sullivan, Shane Washburn, Ryan Smith, and Case Agent John Taylor, with the Bureau of Alcohol Tobacco and Firearms testified on behalf of the United States. The United States also introduced evidence including photographs of Coleman

and a videotape of Officer Washburn's post-arrest interview of Coleman. Coleman took the stand on her own behalf. Her cousin, Joseph Cannon, who was a passenger in the car on the day of her arrest, also testified on her behalf. At the conclusion of the hearing, the parties were granted additional time in which to file post-hearing briefs. Post-hearing briefing concluded on June 26, 2014, and the matter is now ready for ruling. (*See* Doc. Nos. 32-33).

Based upon the evidence adduced at the hearing on the motion to suppress and the briefs of the parties, the undersigned makes the following findings of fact and conclusions of law.

## **FINDINGS OF FACT**

### A. *Detective Sullivan's Identification of Coleman*

Bobby Sullivan is a detective with the Sikeston Department of Public Safety who has been in law enforcement for 20 years. Detective Sullivan was familiar with Coleman before December 28, 2013. He had become familiar with her six to eight years before December 28, 2013, as the result of prior arrests, interviews and other investigations. About a month before December 28, 2013, Detective Sullivan met with Coleman for over an hour at the DEA office in Cape Girardeau.[1]

On the afternoon of December 28, 2013, Detective Sullivan was off duty and happened to be in the city of Sikeston when he spotted Penny Coleman. She was behind the wheel of a gray Chrysler that was stopped and waiting to make a left-hand southbound turn. Detective Sullivan drove past Coleman's vehicle and got to within six feet of her vehicle. He was able to get a clear

---

[1] The *reason* for the meeting between Coleman and Detective Sullivan is disputed; however, the *fact* that the meeting took place is not. Detective Sullivan testified that Coleman went to the DEA office in Cape Girardeau to meet with officers about the possibility of becoming a confidential informant. However, Coleman denied that she met with officers at the DEA office for the purpose of becoming an informant; instead, she testified that she was questioned about alleged ongoing drug trafficking activity. This factual dispute need not be resolved in order to properly dispose of the legal issues raised in Defendant's suppression motion.

3

look at her face. Detective Sullivan believed Coleman's driver's license was suspended, so he contacted dispatch to confirm his suspicion. The dispatcher confirmed that Coleman's license was suspended and advised that Coleman had a possible felony arrest warrant from Indiana.

After receiving confirmation from dispatch that Coleman's license was suspended and that she had a possible felony arrest warrant, Detective Sullivan circled around and approached Coleman's vehicle from the rear. He got as close as approximately one car length away from Coleman's vehicle and was able to make out a partial license plate number. As he approached Coleman's vehicle from the rear, Detective Sullivan was talking to Sikeston police officer Sergeant Ryan Smith, on his cell phone. He relayed to Sergeant Smith the make, model, and partial license plate number of the car. Detective Sullivan also contacted Sikeston police officer, Shane Washburn, and relayed the same information to him. Sullivan told both officers that he had seen Penny Coleman driving in the area of School Street near Ruth Street. He also told both officers that he had confirmed with dispatch that Coleman had a suspended or revoked driver's license and an active felony warrant from Indiana. Detective Sullivan also gave the officers a description of the car Coleman was driving, including the partial license plate number, and told the officers to intercept Coleman. He told both officers "if she is in Sikeston, she's up to no good."

### B. *Officer Washburn's Identification of Coleman*

Officer Washburn testified that he received a call from Detective Sullivan on his cell phone around 2:45 P.M. on December 28, 2013. At that time, Officer Washburn was attending the pre-shift roll call and getting instructions for the day. Officer Washburn testified that Detective Sullivan told him that he had observed a female he identified as Penny Coleman driving in the area of School Street near Ruth. Officer Washburn also testified that Detective

Sullivan gave a description of the vehicle, including a partial license plate number. Finally, Officer Washburn testified that Detective Sullivan told him that he (Sullivan) had confirmed that Coleman had a suspended driver's license and a felony warrant out of Indiana. Officer Washburn further testified that Detective Sullivan encouraged him to stop Coleman based on Sullivan's observation.

Officer Washburn was not familiar with Coleman on December 28, 2013. However, he obtained her driver's license photograph through an email from the Department of Revenue. *See* Govt.'s Ex. 1. The photograph depicts Coleman as a heavy-set African American female with a low-cut curly afro. Although he viewed the driver's license photograph in his car on his cell phone, he was stopped at the time he viewed the photograph and was using a cell phone with a large screen that clearly displayed the photograph.

About 15 minutes after receiving the call from Detective Sullivan, Officer Washburn drove to the location where Detective Sullivan had seen Coleman. Once in the area, Officer Washburn saw a car matching the description and partial license plate number relayed by Detective Sullivan. Officer Washburn positioned his patrol car in a way that allowed him to get a look at the driver of the vehicle as well as the other two passengers in the car. Officer Washburn concluded that Coleman was the driver of the vehicle because the driver of the vehicle matched Coleman's driver's license photograph and because none of the other passengers looked like Coleman's driver's license photograph.

Coleman testified that she looked dramatically different from her driver's license photograph on December 28th. Pointing to shoulder-length hair extensions she was wearing at the time of the evidentiary hearing, Coleman testified that the extensions she was wearing at the hearing were the remnants of a wig she was wearing on December 28th. Coleman described the

wig she was wearing on December 28th as having straight, black, shoulder-length hair with bangs that hung down just above her eyebrows. Coleman also testified that at the time her driver's license picture was taken, she was taking medication that made her look much heavier than she looked on December 28th.

Evidence presented at the hearing does not support Coleman's testimony. Although Coleman's face looks a little fuller in the driver's license picture, it is obvious that the person in the driver's license photograph is the same person in the photograph taken at the time of Coleman's arrest. *See* Govt.'s Ex. 1 & 2. Coleman's appearance on the post-arrest videotape is also very similar to her appearance in the driver's license photograph. *See* Govt.'s Ex. 1 & 6. The driver's license photograph, booking photograph, and post-arrest videotape all depict a heavy-set, African American female with a medium to light brown complexion, and dark brown or black low-cut curly hair.

At the hearing, Coleman explained that she was not wearing the wig in the booking photograph because she was required to remove the wig and turn it over after she was taken into custody. While it is certainly possible that Coleman was wearing a long wig at the time of her arrest, it does not seem plausible when the record as a whole is considered. In particular, Officer Washburn's unrebutted testimony was that, to the extent a booking officer is aware of it, a removable wig or hair piece is the type of thing that would be typically be collected and listed on an inventory or booking sheet. He also testified that an arrestee would be prohibited from wearing a removable wig or hairpiece while in the custody of the jail. Officer Washburn was the officer who booked Coleman and testified he had no recollection of a wig either being on Coleman's person or recorded on the booking sheet.

At the hearing, Coleman's attempt to explain why she was not wearing a wig in the booking photograph raised more questions than answers. For example, if Coleman was wearing a wig when she was arrested, why was there no evidence of it in the booking sheet or inventory?[2] Why does Coleman's hair in the booking photograph and in the post-arrest interview videotape look so tidy and fluffy if her curly afro had recently been under the weight of a shoulder-length wig? If, as Coleman testified, she was required to take off the wig and hand it over to police when she was taken into custody (where she remained through the evidentiary hearing) then how is it that she got the wig back and was able to make hair extensions from it while in jail?[3] Coleman's testimony that she was wearing a wig at the time of her arrest is not entirely credible in light of these unanswered questions.

In sum, aside from Coleman's self-interested testimony about her appearance on December 28th, all of the other evidence presented at the hearing supports a finding that Coleman looked very similar to her driver's license photograph when she was arrested.

### C. The Traffic Stop and Vehicle Search

Before stopping the Chrysler, Officer Washburn confirmed that Penny Coleman's driver's license was suspended and that there was a felony warrant for her arrest from Indiana. Once Officer Washburn concluded that the driver of the Chrysler was Penny Coleman, he turned on the lights of his patrol car and the Chrysler pulled over. Sergeant Ryan Smith, who also received instructions from Detective Sullivan to stop Coleman, arrived shortly after Officer Washburn called in the traffic stop. Sergeant Smith approached the male passenger in the front seat, and Officer Washburn approached Coleman and the female passenger in the back seat.

---

[2] Neither party offered the booking sheet into evidence.
[3] Coleman's testimony that she retained the wig and made extensions from it was rebutted by testimony by Officer Washburn's testimony regarding the department's booking procedures.

Officer Washburn identified himself as a police officer with the Sikeston Department of Public Safety and asked the driver for identification, which she was unable to provide. He then asked the driver if she was Ms. Coleman and she said that she was. At that point, Officer Washburn asked Coleman to step out of the car and placed her under arrest for driving with a suspended license and for the outstanding felony warrant from Indiana. Coleman was handcuffed and seated in the back seat of Officer Washburn's patrol car.

The passengers were identified as Joseph Cannon and Tracy Robinson. The officers checked with the dispatcher for warrants on both passengers and found that neither passenger had any active warrants but that both had suspended and revoked drivers' licenses. Officer Washburn concluded that the Chrysler would need to be towed and its contents inventoried pursuant to the Sikeston impound policy. Officer Washburn believed the Chrysler was subject to the Sikeston impound policy because (i) the vehicle was on private property; (ii) the two passengers were eventually picked up by a third party and left the scene; (iii) neither passenger could legally drive the vehicle because of revoked or suspended licenses;[4] and (iv) the vehicle would be unattended.[5]

Officer Washburn and Sergeant Smith both testified that they independently smelled burnt marijuana emanating from the Chrysler when they first approached it. Their testimony was corroborated by Coleman's cousin, Joseph Cannon, the front seat passenger. Mr. Cannon testified that after the Chrysler was stopped, one of the officers approached him on the passenger side of the car and asked if there was any marijuana in the car. Cannon told the officer he didn't

---

[4] The United States offered the tow policy and inventory policies into evidence as Government Exhibits 3 and 4. The Sikeston tow policy, in general, requires that a vehicle be towed if the driver is arrested and the motor vehicle would otherwise be left unattended on public or private property. The inventory policy in essence requires that the contents of a vehicle be inventoried prior to towing under the tow policy.
[5] It was subsequently determined that the Chrysler was an Enterprise Rental car leased to Kedar Bland, a friend of Coleman's.

know if there was marijuana in the car and testified that he did not personally see anyone with marijuana in the car. However, Mr. Cannon admitted on direct examination that the car smelled like marijuana. The officers testified that they decided to search the Chrysler because the vehicle smelled like marijuana.

When the officers began their search of the Chrysler, Sergeant Smith immediately saw a small purse sitting next to the center armrest. He picked it up and found it much heavier than he would have expected given its size and suspected there may be a gun inside. He opened the purse and discovered a loaded two-shot Derringer .380 pistol and a Missouri identification card belonging to Coleman. The officers unloaded the pistol and seized it along with the ammunition. The officers also found and seized a large bag containing checkbooks and other things.

After the officers found the gun, they did a pat-down search of both passengers (Robinson and Cannon), who both denied any knowledge of the firearm. Both passengers were released after the conclusion of the search. Although Coleman initially denied knowledge of the gun, in post-arrest/post-*Miranda* statements made to police, she eventually confessed that she was aware of the firearm and that it was hers.

## **CONCLUSIONS OF LAW**

**A. Officer Washburn Had Reasonable Suspicion to Stop Coleman's Vehicle**

The foregoing factual findings establish that Officer Washburn stopped Coleman because he believed she was driving while her driver's license was revoked and there was a felony warrant for her arrest from Indiana. "[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). In addition, "if police have a reasonable suspicion, grounded in specific

9

and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *United States v. Hensley*, 469 U.S. 221, 229 (1985). In determining whether a police officer had reasonable suspicion of criminal activity, the court must consider the "totality of the circumstances as 'understood by those versed in the field of law enforcement.'" *United States v. Gray*, 213 F.3d 998, 1000 (8th Cir. 2000) (quoting *United States v. Cortez,* 449 U.S. 411, 418 (1981)).

Coleman does not dispute that her driver's license was revoked or that there was an active felony warrant for her arrest from Indiana. Coleman also does not contest that Detective Sullivan saw her driving the Chrysler. Rather, Coleman seems to contend that Officer Washburn either did not rely, or could not reasonably rely on Detective Sullivan's statements about Coleman. As a result, Coleman posits Officer Washburn did not have a constitutionally sufficient basis for the stop because she looked dramatically different from her driver's license photograph on the day of her arrest. These arguments fail for several reasons.

First, Coleman's contention that Officer Washburn did not rely on Detective Sullivan's statements about Coleman is not supported by the record. Although there is no evidence that Sullivan gave either officer a physical description of Coleman, the evidence presented establishes that Washburn obtained and relied on information from Sullivan about Coleman's gender, driver's license, and wanted status, as well as information about the vehicle she was driving. The testimony also established that the officers were acting in response to Sullivan's instruction that they stop or otherwise intercept Coleman.

Next, an officer's reasonable, articulable suspicion need not be based solely on the personal knowledge of the arresting officer. Rather, so long as there is some degree of

communication between the investigating officers, an officer's reasonable, articulable suspicion may be predicated on information provided by other law enforcement officers as well as the officer's own observations. *See Hensley*, 469 U.S. at 232 (holding that "if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information") (citations omitted); *United States v. Farnell*, 701 F.3d 256, 262 (8th Cir. 2012) (holding that an officer's reliance on a police bulletin, coupled with defendant's physical appearance and location, provided an objectively reasonable basis for a *Terry* stop even though officer's observation of the person was brief and from a distance and there had been no traffic violations or other independent reason to stop the vehicle); *United States v. Robinson*, 664 F.3d 701, 703 (8th Cir. 2011) (recognizing that "'[w]hen multiple officers are involved in an investigation, probable cause may be based on their collective knowledge and need not be based solely on the information within the knowledge of the arresting officer as long as there is some degree of communication'") (quoting *United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011)).

Officer Washburn's reliance on information he received from Detective Sullivan was reasonable and did not deprive the stop of a constitutional justification, because Sullivan's statements that Coleman was violating the traffic law or had committed a felony in Indiana were based on reasonable articulable suspicion, if not probable cause. Detective Sullivan's unrebutted testimony was that he knew Coleman prior to December 28, 2013 and saw her driving the Chrysler when he suspected that her license was suspended. Detective Sullivan confirmed his suspicion by checking with the dispatcher and in so doing learned that Coleman also had a felony

11

arrest warrant from Indiana. Detective Sullivan relayed this information to Officer Washburn and Sergeant Smith and instructed them to stop her. In light of the record evidence, Sullivan's communications to Officers Washburn and Smith is analogous to a police bulletin or dispatch which the Eighth Circuit has consistently held may provide an objectively reasonable basis for a *Terry* stop.

The Eighth Circuit's decision in *Farnell* is instructive. In *Farnell*, a Missouri State Highway Patrol Officer stopped Farnell on suspicion that Farnell had robbed a bank in Cuba, Missouri. *Farnell*, 701 F.3d at 259. At the time of the stop, the officer was aware of a police dispatch regarding a bank robbery that had taken place earlier that morning in Cuba, Missouri. *Id.* at 258-59. The dispatch described the suspect's vehicle as a white van and the suspect as a heavy-set, white male wearing a dark baseball cap, dark sunglasses, and a blue long-sleeved button down shirt. *Id.* The officer positioned himself at an intersection along a known travel route from Cuba to the interstate highway and observed Farnell's van approaching him approximately one hour after the dispatch regarding the robbery. *Id.* at 262. When Farnell drove past the officer, Farnell shielded his face with his hand. *Id.*

Farnell moved to suppress evidence found during a search of his vehicle, claiming that the stop and search of his vehicle violated his Fourth Amendment rights because the only basis for the officer to pull him over was that he was a heavy-set, white male driving a white van, and that these circumstances alone do not constitute "reasonable suspicion." *Id.* Farnell noted that he was wearing clothes different than the suspect's clothes described in the dispatch; that his van had different license plates than the ones in the dispatch; and that the officer did not claim that he committed any traffic violations. *Id.* The Eighth Circuit rejected Farnell's arguments on the following grounds:

> We have several times stated that if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information. Moreover, a person's physical appearance and location relative to a known crime scene can provide an objectively reasonable basis for an officer to stop that person, even where the officer's observation of the person is brief and from a distance and there had been no traffic violations or any other independent reason to stop the vehicle.

*Id.* (internal citations and quotation marks omitted).

Like the officer in *Farnell,* at the time of the stop Officer Washburn was armed with both the information obtained from Detective Sullivan and information obtained through his own independent investigation and observations. Washburn obtained a driver's license photograph of Coleman, which depicted her as a heavy set African American female, and independently confirmed with dispatch that her license was suspended and that there was a felony warrant for her arrest from Indiana. Washburn positioned himself in a manner that allowed him to get a look at all of the vehicle's occupants, including the driver, and was able to compare the driver's license photograph to the driver.

As discussed in the factual findings, Coleman's booking photograph and post-arrest video, together with Officer Washburn's testimony, establish that Coleman looked strikingly similar to her driver's license photograph at the time of the stop. However, even if Coleman's testimony that she was wearing a wig is credited, Detective Sullivan's uncontroverted identification of Coleman coupled with Washburn's own observations and independent investigation support a finding that Officer Washburn had, "at a minimum, a reasonable suspicion that [Coleman] was engaged in criminal activity when he turned on his lights" and stopped Coleman's vehicle. *Farnell*, 701 F.3d at 262.

## B. The Officers' Search of the Vehicle Was Supported by Probable Cause

The search of the Chrysler was based on the officers independently smelling the odor of burnt marijuana in the car. Subject to specifically established and well-delineated exceptions, searches conducted outside the judicial process, without prior approval by a judge, are *per se* unreasonable under the Fourth Amendment. *See United States v. Davis*, 569 F.3d 813, 816 (8th Cir. 2009) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). Among the exceptions to the warrant requirement is the "automobile exception," which "'authorizes officers to search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity.'" *Id.* at 816 (quoting *United States v. Hill*, 386 F.3d 855, 858 (8th Cir. 2004)).

The Eighth Circuit has repeatedly held that a warrantless search of a vehicle is justified by an officer smelling the odor of burnt marijuana. *See United States v. Brown*, 634 F.3d 435, 438 (8th Cir. 2011); *United States v. Peltier*, 217 F.3d 608, 610 (8th Cir. 2000) (holding the smell of marijuana gave the deputy probable cause to search defendant's truck for drugs); *United States v. Neumann*, 183 F.3d 753, 756 (8th Cir. 1999) (stating "detection of the smell of burnt marijuana . . . gave [the officer] probable cause to search the entire vehicle for drugs"). If probable cause justifies the search of a vehicle, "it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Coleman*, 700 F.3d 329, 336 (8th Cir. 2012) (holding officer could lawfully search every part of defendant's motor home where marijuana might have been, including under the bed where the weapon was found).

Here the testimony of Officers Smith and Washburn, as well as the testimony of the front seat passenger, Joe Cannon, unequivocally establish that the Chrysler smelled of burnt marijuana when the officers approached. As such, the officers had probable cause to search the entire

14

vehicle for marijuana, including the small purse near the center arm rest in which the firearm was found.

## **CONCLUSION**

For all of the foregoing reasons, Defendant's motion to suppress evidence and statements (Doc. No. 26) should be denied.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 17th day of July, 2014.